**MED–CARE ASSOCIATES, INC., Respondent,**

v.

**Arthur NOOT, Commissioner of Public Welfare, Appellant.**

**No. C5–81–1204.**

Supreme Court of Minnesota.

Feb. 11, 1983.
Rehearing Denied March 31, 1983.

Hubert H. Humphrey, III, Atty. Gen., and P. Kenneth Kohnstamm, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Doherty, Rumble & Butler and George L. May, St. Paul, for respondent.

WAHL, Justice.

The issue raised by this appeal is whether the Commissioner of Public Welfare (Commissioner) properly applied the rate limitation statute, Minn.Stat. § 256B.45, subd. 3 (1982), to the Medicaid reimbursement paid to Med-Care Associates, Inc. (Med-Care) for nursing home services. The trial court held that the grandfather clause amendment prohibits the statute's application in this case and that the Commissioner had wrongfully limited Medicaid reimbursements to Med-Care. We reverse.

Prior to 1976, the Medicaid program, through the Department of Public Welfare, reimbursed in full reasonable rental rates paid by nursing homes operating on a lease basis. As part of an attempt to shift Medicaid costs from property-related costs to patient-related costs, the legislature in 1976 enacted the following rate limitation:

> If a nursing home is operated on a lease basis, the state agency shall not recognize as an allowable cost any rental fee in excess of the total amount it would pay to the owner of the facility as interest, investment allowance and depreciation allowance.

Minn.Stat. § 256B.45, subd. 3. Concerned that this statute unfairly imposed the limitation on nursing home operators who were bound by pre-existing leases, the legislature enacted the following amendment to the provision in May 1977:

A lease entered into before April 13, 1976 is not subject to this subdivision until the date of the next renewal.

Med-Care is a wholly owned subsidiary of Reuss, Thiss and Company, a general business consulting firm which has $3,000 invested in Med-Care's capital stock and paid-in capital. Med-Care entered into a lease with Aviv Homes, Inc. on August 28, 1973, to take over operation of three nursing homes. The lease provided for a primary term of 5 years dating from September 1, 1973. Paragraph Four provided:

OPTION TO EXTEND. 4. If Tenant is then not in default under this Lease, it is hereby granted the option to renew the lease for an additional five-year term following the primary term, upon the same terms and conditions as are set forth herein (except for the new rent schedule provided under the Lease) by giving to Lessor written notice of its intention to exercise the option at least one hundred eighty (180) days before the end of the original five-year term of this Lease.

Paragraph Five provided for monthly rent, escalating yearly. Its last subdivision provided: "5(E). Should Tenant exercise the option to renew the Lease, for the option period, Tenant shall pay to Lessor at the office of Lessor or at such other place as Lessor shall designate in writing, as basic rent, the sum of $64,170.00 per month in advance." On November 2, 1977, Med-Care sent written notice to Aviv Homes, Inc. of its exercise of the option. The second 5-year term began to run on September 1, 1978.

The Department of Public Welfare (DPW) became aware that the option had been exercised when, in 1979, it conducted its annual desk audit of Med-Care's nursing homes for the year 1978. On October 12, 1979, Med-Care received notice from the DPW that, because Med-Care had renewed its lease, it would no longer receive full reimbursement of its rental payments. Under the rate limitation, Med-Care would receive about $27,000 per month in rental reimbursement instead of the $64,170 called for in the option's rental schedule. Med-

Care then filed a complaint asking for a declaratory judgment that it was protected from the limitation by the grandfather clause amendment. Its claim was based on the contention that its lease option was an extension, not a renewal, and thus that the limitation could not be applied to it until the second 5-year term was completed.

The issue of the intent of the parties has been argued extensively. The trial court concluded that any ambiguity as to whether the option was an extension or a renewal was resolved by the document itself and thus that intent was irrelevant. The court found that there was a legal distinction between the concepts of renewal and extension and that this option was an extension. The court concluded that, had the legislature intended to include extensions through use of the term "renewal," it would have been precise in indicating its intent, especially where a good-faith reliance could result in a substantial loss.

The legal distinction between an extension and a renewal of a lease is that an extension merely continues the original lease, while a renewal requires a new lease. *Tilleny v. Knoblauch,* 73 Minn. 108, 113, 75 N.W. 1039, 1041 (1898). If any contractual term for the additional period must be negotiated or determined, the statute of frauds requires a new lease, and the new period is a renewal. If the lease is continued by the party holding the option merely on timely notice or on some other condition, no new lease is required, and the option is an extension. *Id.* Because in the instant case the rent schedule for the second 5 years was set out in the original lease and no terms were to be changed, notice alone could and did effect the continuation. The trial court correctly concluded that the exercise of the option resulted in an extension of the lease.

The Commissioner does not dispute this basic distinction. Rather, he argues that this court has used the terms synonymously when no new negotiations were required. Moreover, he notes, the terms are used synonymously in legal documents, as they were in the lease under consideration here.

In support of this contention, the Commissioner cites *Bergstein v. Bergquist,* 152 Minn. 358, 363, 189 N.W. 120, 122 (1922), where a 2-year lease granted the lessee the "privilege of renewing" the lease "under the same terms and conditions." Because this was an extension, a new lease was not required, but this court referred to the option as both an extension and a renewal. Similarly, in this case the parties used the terms interchangeably in the lease, alternately referring to the option as an extension and as a renewal. The Commissioner questions whether the terminological distinction can be rigorously applied to the option when this court and the document itself have not carefully observed distinct labels for the admittedly distinct concepts.

The intent of the legislature in enacting the 1977 amendment is decisive. The Commissioner argues, as he argued on post-trial motion to the court below, that the legislature intended to except only those operators "trapped" into pre-existing leases. Med-Care, while conceding that this court must look to the purpose behind the statute in its interpretation, argues that the legislative draftsmen intended to prohibit the indefinite continuation of leases already in existence. Thus, because its lease provides for a "finite" extension rather than multiple renewals, excepting it from the rate limitation does not thwart legislative intent. We find no support for this theory, nor does Med-Care cite any.

The legislature, in enacting the original rate limitation statute in 1976, clearly intended to reduce payments to all nursing home lessees which exceed the amount that would be paid the lessors/owners if the owners operated the nursing homes. The mandate was, as the Hearing Examiner who reviewed the DPW's proposed implementation of the new rate limitation recognized, "severe cost containment and immediate application, even to existing facilities and their financial arrangements * * *." On application of the statute, however, it became apparent that those lessees whose rent was irrevocably set by leases predating the statute were being unfairly penalized. To remedy this problem, the legislature, at its next session, enacted the grandfather clause at issue in this case, exempting from the rate limitation, until the date of their next renewal, those leases entered into prior to April 1976. Both the legislative history of the clause and the strict construction required for exceptions, 2A J. Sutherland, *Sutherland Statutes and Statutory Construction,* § 47.12 (4th ed. 1973), lead us to conclude that the legislature intended to grant the exemption only until lessees who were trapped by irrevocable rents had an opportunity, after the effective date of the statute, to opt out of those unfavorable leases. The use of the term "renewal" is not determinative. We have used the term "renewal" to refer to both extensions and renewals and conclude that the legislature used the term in the same manner. Thus, we hold that the legislature intended to include extensions through use of the term "renewal" in Minn. Stat. § 256B.45, subd. 3. Implementation of the legislative intent requires application of the rate limitation to Med-Care's second 5-year term.[1]

Reversed.

---

1. Med-Care claims that it would be inequitable to treat the option as a renewal and yet force it to depreciate over 10 years leasehold improvements and a maintenance reserve fund paid into during the primary term. In requiring Med-Care to depreciate these assets in this manner, the DPW was following its own Rule 49, 12 M.C.A.R. 2.049D.4.d (2) (1982), which expressly states that leasehold improvements are to be depreciated over the term of the lease, including renewal periods. The maintenance fund was treated in the same manner.